# CHARLESTON.

## STATE *v.* EMBLEM.

Submitted June 16, 1903—Decided April 1, 1904.

1. HOUSE OF III FAME—*Evidence*—*Fraudulent Sale*
   Upon the trial of an indictment for leasing and letting a house to be used as a house of ill fame, a written instrument, signed and acknowledged by the parties, purporting to be a contract for the sale of the property, relied upon as a defense, may be

shown by the State to be a collusive, fraudulent paper, executed for the purpose of evading the statute, and, although, on its face, a contract of sale, to be only a colorable and sham sale, not precluding the existence of the relation of landlord and tenant between the parties.     (pp. 684, 685).

2.  EVIDENCE.
    To avoid the effect of such a paper, the State need not establish, by direct evidence, a separate verbal or written contract of lease. It may be inferred from facts and circumstances, showing the fraudulent intent and purpose of the parties in the execution of the pretended contract of sale.  (p. 686).

Error to Circuit Court, Ohio County.

Elizabeth Emblem was convicted of misdemeanor and brings error.

                                                        *Affirmed.*

DOVENER & CONIFF, for plaintiff in error.

F. W. NESBITT and ATTORNEY GENERAL, for the State.

POFFENBARGER, PRESIDENT:

In the criminal court of Ohio county, Elizabeth Emblem was convicted on a charge of unlawfully, wilfully and knowingly leasing and letting a certain house to one Minerva Martin to be used or kept as a house of ill-fame and subjected to a fine of two hundred dollars, and of that judgment she complains.

She rested her defense upon an alleged executory contract of sale of the property to the person using it as aforesaid, and, as evidence thereof, introduced what purports to be a written contract, whereby she agreed to sell, and the other party to buy, the property for and in consideration of the sum of $7,500.00 on the following terms: $40.00 cash, the receipt of which was thereby acknowledged and the balance in equal payments of $312.09, payable every quarter, all to be fully paid on or before the 1st day of October, 1906. It further provided for the payment of interest on all deferred payments in advance at the rate of 8 per cent, and that the said Martin should pay all taxes and assessments of every kind that should be levied on the property after the date of the agreement.

In addition to the foregoing provisions, the contract contained the following clauses::

"It is expressly agreed by and between the parties to this agreement that if any one of said installments, or the interest

.accrued thereon, shall not be paid within three days after fall-
ing due, then all of said installments remaining unpaid shall
at once become due and payable, at the election of the said first
party."

"And the interest paid on such purchase money shall be re-
tained by the party of the first part for the use and occupation
·of said property by the said second party, prior to said default;
and in case said interest is not paid in full up to the time of said
·default, then the first party *sahll* have the right, and it is hereby
expressly agreed, that the personal property of the · said sec-
·ond party, now on said premises, or put on said premises dur-
ing the time of this contract, shall be subject to a sale by the
said first party to pay the balance of said interest up to the
time of said default, the proceeds of which sale shall be re-
tained by said first' party for the use and occupation of said
property."

"Now, therefore, if the said party of the second part, her
heirs, executors, administrators or assigns, shall well and truly
pay the said purchase money, interest, taxes and assessments
named in this agreement as it becomes due, the party of the
first part, or her heirs, will well and truly make, execute and
deliver unto the party of the second part, or her legal represen-
tatives, a good and sufficient deed of the land aforesaid. But
failure of the party of the second part to pay the purchase
money, or any part thereof, or the interest, taxes and assess-
ments, as above mentioned, then this agreement shall be void
as it regards the party of the first part, at her option."

The evidence fixes the value of the property at $3,200.00 or
$3,300.00, and the rental value at $22.00 or $23.00 per month.
Minerva Martin applied for the house as tenant, but was in-
formed by Mrs. Emblem it was for sale but not for rent. She
then inquired about the terms and Mrs. Emblem responded by
asking how much she could pay down. She said $15.00, which
she paid and was let into the property and has since paid $12.50
per week. The contract was not signed until about four weeks
later, when she was called in for the purpose by Mrs. Emblem.
They both signed and acknowledged it before a notary public
and later Mrs. Emblem had it recorded in the county court
clerk's office. The weekly payments were called interest, and
no demand had ever been made for payment of any part of the

principal. When she made application for the house Minerva
Martin was a stranger to Mrs. Emblem, and no inquiry as to her
ability to pay for it was made, nor was the value of the
property discussed, nor the price. Nothing was discussed but
the interest. Mrs. Emblem asked how that was to be paid,
but did not even mention the price of the house. Mrs. Emblem
resided in another building standing close to the house in
question.

At the instance of the defendant the following instructions
were given:

"2. The court instructs the jury that if they believe from
the evidence that the contract introduced in evidence between
the defendant, Elizabeth Emblem, and Minerva Martin, for the
property mentioned in the indictment, was a *bona fide* contract
of sale, and that under said contract the said defendant parted
with the ownership and control of said property, then the jury
must find the defendants not guilty."

"3. The court instructs the jury that if they believe from
the evidence in this case that the contract of sale introduced in
this case operated between the parties thereto as a *bona fide*
sale of the property mentioned in the indictment, then, even if
they believe that the defendant knew that the property was to
be used as a house of ill-fame, the jury must find the defendant
not guilty."

"4. The court further instructs the jury that the contract
introduced in this case is upon its face a contract of sale between
Elizabeth Emblem and Minerva Martin for the sale of the
property named in the indictment, and that it is a question for
the jury whether such contract was *bona fide* or not."

The court refused to give the following instructions, request-
ed by the defendant:

"7. The court instructs the jury that if they believe
from the evidence that the defendant, Elizabeth Emblem, and
Minerva Martin, made and entered into the contract of sale
introduced in the evidence, of the property named in the in-
dictment, and further believe that said Minerva Martin occu-
pied said property under said contract of sale, then the jury
must find the defendant not guilty."

"8. The court instructs the jury that paper writing intro-
duced in evidence, is by its terms and in legal effect a contract

of sale, and not a lease, and that if Minerva Martin occupied said property under said contract of sale, then the jury must find the defendants not guilty."

"9. The court instructs the jury that if they believe that the contract of sale introduced as evidence in this cause is such a contract as would bind the defendant, or such as the law would enforce between them, then the contract is *bona fide* and they should acquit the defendant."

From an examination of the instructions given and refused, it is apparent that the ruling in *State* v. *Emblem,* 44 W. Va. 521, does not govern this case. Here the jury have been instructed that the paper writing introduced is on its face a contract of sale. See instruction No. 5. This instruction and others given submitted to the jury the question, whether it was a *bona fide* contract of sale. Instructions Nos. 7 and 8, refused, were so framed as to exclude this inquiry. Taken as a whole, these instructions are not open to the objection pointed out in *State* v. *Emblem,* 44 W. Va. 521. On the contrary, they submit the very question which the Court, in that case, said was proper to be submitted to the jury, namely, whether the contract was a sham and a device. The jury were told, by instructions Nos. 2 and 3, that, if they believed from the evidence that the contract had been entered into in good faith as a contract of sale, they should find for the defendant, even if they believed she knew the property was to be used as a house of ill-fame. If the contract was never intended to be enforced nor to effect a change of ownership or control of the property, but only to be used as a protection from prosecution for violation of the statute, it was not a *bona fide* contract, and, if the evidence was such that the jury could find that it had been executed for that purpose and no other, the court properly gave these instructions and refused instruction Nos. 7 and 8. Said last-mentioned instructions are inconsistent with the others. They say mere occupancy of the property under the contract, without regard to the intent of the parties or the function the contract was to perform, entitled the defendant to an acquittal. If given, they would have amounted to a direction to find for the defendant, and this would have been irreconcilable with the submission by the other instructions of an inquiry as to a fact, upon the result of which the finding was said to be dependent. Instruction No. 9 seems to have been

framed for the purpose of obtaining from the court for the guidance of the jury a definition of the terms "*bona fide* contract" used in some of the other instructions, and, if it had properly defined the terms, it should have been given. But it did not do so. On the contrary, its effect would have been to confuse and mislead instead of to enlighten. Whether a contract is binding and enforcible by law is a much broader and more difficult question to answer than whether the parties entered into it with honest and lawful intentions. Moreover, it is a question of law and not of fact, and one for the court and not for the jury. The manifest purpose in asking this instruction was to nullify other instructions given by obtaining from the court a construction of them that would preclude any inquiry on the part of the jury as to the intent of the parties to the contract and the purpose for which it was executed.

It remains now to say whether the evidence is such as warranted the giving of the instructions and is sufficient to sustain the verdict. If not, instructions Nos. 7 and 8 should have been given and the others refused, and the verdict set aside. The ostensible purchaser was a strange woman who came with the pittance of $15.00 in her possession to rent a property worth about $3,300.00. Without any previous inquiry as to her ability to pay for it or any discussion of price or terms, except the payment of $50.00 per month to be known as interest, the property was sold on the spot to this strange, penniless woman at the price of $7,500.00, and she was let into possession of it. In addition to the $50.00 per month interest, she was to pay $312.09 of the principal every quarter, besides taxes and all other assessments, making more than $154.00 per month to be paid under the contract. Where did Mrs. Emblem suppose the money was to come from? Did she expect it to be earned in washing, sewing, teaching, clerking or any other honest vocation such as could possibly have been followed by the woman who applied to her for the property? On the payment of $15.00 the woman was let into the house, four weeks before the contract was signed. Is it customary or consistent with business principles to put a purchaser under an executory contract of sale in possession of real property without payment of any of the purchase money and prior to the execution of the written contract? It sometimes occurs between parties having confi-

dence in each other, but are rank strangers so let into property as purchasers? The woman used the house from October, 1900, until she was indicted in July, 1901, and was still occupying it at the time of the trial in November, 1901, and no part of the purchase money was ever paid or demanded, but the interest was paid every week. This circumstance standing alone would signify little, if anything, but considered in connection with what transpired at the inception of the arrangement between these parties, it has force and weight. Nothing was of sufficient importance then to merit discussion but the "interest," subsequently nothing was collected or demanded but the "interest." This imports that the contract was never intended to have any effect or to be enforced. Did Mrs. Emblem know the purpose for which the house was to be used? The rent stipulated for under the designation of interest was double the rental value of the property for ordinary purposes. She took a contract which she knew was impossible of performance, except as to the weekly payments of "interest," and which no responsible party would have executed. She declined a rental contract which would have been consistent with the ability of the applicant. All these unusual, extraordinary and apparently unreasonable acts taken in connection with the close proximity of her residence to the property, and the fact that it was used for the illegal purpose aforesaid for about four weeks before the contract was signed, were amply sufficient to warrant the finding that she knew, at the time she executed the paper, what use was to be made of it. This unusual and extraordinary conduct does not emanate from imbecility, and can hardly be regarded as merely fortuitous. Presumably there is method and a purpose in it, something different from, and beyond, an ordinary sale of real estate. These circumstances plainly indicate that it was not in fact intended to be a contract of sale, and as they support the hypothesis of an arrangement to give legal color to an illegal transaction, it was competent to direct an inquiry by the jury as to whether that was the actual arrangement.

It is insisted that, in order to sustain a conviction, there must be evidence of a secret verbal or written agreement for a lease of the property, contrary to, and inconsistent with, the alleged contract of sale—something in the nautre of a defeasance, by which control of the property is retained by the al-

leged vendor. This is wholly unnecessary, for the jury have found that the written instrument never was intended to have any force or effect as between the parties, but is a mere collusive arrangement between them and against the public, to prevent the enforcement of the statute. They have found from the circumstances, the only kind of evidence obtainable in such cases, that it was understood and agreed between these parties that, notwithstanding the contract, the ostensible vendee was never to pay, nor the vendor to collect, anything but the $50.00 per month, and that, although that was called interest on purchase money, it was, in fact, nothing but rent.

The power to ascertain the intent of parties and deal with them accordingly where an attempt is made to evade the criminal law is well settled. Even the records of courts may be overturned on the ground of fraud and the criminal attempting to hide himself thereunder brought forth and punished.

"A judgment of acquittal upon a verdict procured by fraud will not bar a second trial for the same offense. Even if a third person fraudulently manages to be put upon the jury to acquit a prisoner, the latter will not be deemed in jeopardy from the panel so constituted, though himself innocent of the fraud, and the judge may direct the juror's withdrawal." Bishop Cr. Law, section 119.

"If one procures himself to be prosecuted for an offense which he has committed, thinking to get off with a slight punishment and to bar a real prosecution in the future—if the proceeding is really managed by himself, either directly or through the agency of another—he is, while thus holding his fate in his own hand, in no jeopardy. The plaintiff State is no party in fact, but only such in name; the judge indeed is imposed upon, yet in point of law adjudicates nothing; all was a mere puppet-show, and every wire moved by the offender himself. The judgment therefore is a nullity, and is no bar to a real prosecution." Bish. Cr. Law, section 1010. A familiar maxim of the law is that fraud vitiates everything. It binds neither the State, the courts nor individuals, whatever the form of its covering may be. The intent to cover and hide the offense here charged, by this alleged contract of sale, and to set up a sham, shift and device under which the forbidden acts may be done with impunity, is so apparent that, to permit it to stand, by denying

the right of the courts to go under it and dig up the intent of the parties with which to condemn it as a glaring and brazen fraud upon the public and an attempted obstruction to the administration of the criminal law, would be a travesty upon justice and a capitulation on the part of the courts and the legislature to the powers of darkness, as well as a violation of legal principles.

Whether Mrs. Emblem is liable is not determined by her declaration of non-liability in respect to the transaction, nor does her notice thereof to the public by the recordation of the contract avail anything. Whether she is guilty is a question of law, dependent upon the facts found from all the evidence, and a self-serving act or declaration, forming a part of it, if competent, has only such weight as the jury may deem it entitled to under all the circumstances. The recordation of the contract is a self-serving act, condemnatory in its effect, if it has any weight. She could have no purpose in it other than that of attempting to give her fraudulent evasion of the law an appearance of fairness. It was not notice of any lien, or title in her for the protection of which recordation of the paper was necessary.

The admission and subsequent exclusion of certain improper evidence is assigned as error for which there should be a reversal. Upon this question, the authorities are divided. Thomp. Trials, sections 351, 723. In *Specht* v. *Howard,* 16 Wall. 564, and the decisions of a number of the States, it is held not to be reversible error, if error at all. Of course inadmissible evidence, or rather that which is not evidence, but relates to the parties or the subject-matter of the controversy, should not be stated in the hearing of the jury, but errors will occur in all courts, and they are allowed to correct their own errors in proper time, and, when they have done so, the injury ought to be deemed to have been cured and repaired. To say it is not accomplished by the instruction of the judge to the jury not to consider the condemned and excluded evidence, and his rejection of it, because it is not evidence, is to impute to the jury a stupidity and lack of intelligence and mental powers, incompatible with the solid qualities which the law accredits to jurors.

Mrs. Emblem was convicted on another indictment for leasing or letting another house to Gene Edwards for the same

unlawful purpose. Upon the trial of it, the evidence and rulings of the court were in all substantial respects the same as in this case, and the foregoing rulings and observations render it unnecessary to write a separate opinion in it.

As the two judgments complained of are free from error, they will be affirmed.

*Affirmed.*

DENT, JUDGE (*dissenting*):

William and Elizabeth Emblem entered into conditional contracts of sale of their separate properties to separate grantees, placed them in possession and the contracts, which were in writing, on record.

Sometime afterward they were indicted, charged with renting or leasing their properties and permitting them to be used for the purpose of maintaining houses of ill fame. They were found guilty and obtained writs of error to this Court.

The evidence shows that at the time of the contracts they surrendered all ownership and control of the properties to their grantees, and there is no evidence tending to show that they claimed or were exercising ownership or control over the properties at the time the indictments were found. A similar case founded on a similar contract against the same parties was heretofore determined by this Court. *State* v. *Emblem,* 44 W. Va. 521.

The sole question submitted to and determined by the jury was whether the conditional contracts of sale were mere shifts or devices to cover up the leasing of the property for the unlawful purpose aforesaid, and not a parting with the ownership and control of the property. The jury answered in the affirmative and this Court is now called upon to say whether the evidence was sufficient to justify such finding. There was no evidence at all showing that the defendants exercised any acts of control or ownership over the property, and the jury was left to infer from the nature of the contracts and the uses to which the property was being put, with the knowledge of the defendants that the contracts, though on their faces conditional contracts of sale, were mere shifts and devices to cover up a leasing or renting of the property with knowledge of the purposes to which it was being put.

This finding, in my opinion, is not justified by the evidence for the reason that the defendants had the right to sell their properties and surrender control and ownership thereof, to avoid liability under the statute before such liability arose or attached. And it matters not that this was their object in so doing, so they surrendered complete control and ownership, they could thus relieve themselves from future liability. The owner and controllers of the property could be held liable, but not those who had disposed of their ownership and control, though it be only conditionally done. The statute is only intended to cover the leasing of the property by the owner and controller thereof and not sales thereof, either conditional or absolute. Such statutes are strictly construed and strictly confined to those who are plainly included in the language thereof. 1 Bish. Crim. Law, sec. 693; *Mitchell* v. *State*, 34 Texas Crim. Rc. 311; *Lamar* v. *State*, 30 Texas App. 693.

It may undoubtedly be inferred from the evidence that the defendants entered into the contracts to avoid liability under the statute. This they had the same right to do as any person has the right to avoid being guilty of a crime, or being responsible therefor. If, however, it had been shown that the contracts were entered into not for the purpose of avoiding guilt, under the statute, but for the purpose of doing the thing forbidden by the statute, under the guise of a sale, and that the defendants still continued to exercise ownership and control over the property, they could have been justly convicted. There is no evidence justifying such conclusion, at least beyond a reasonable doubt, but the State's case is wholly lacking in this respect.

The question is whether the defendants, acting in good faith, had the right to shift all future liability before the same attached, as owners and controllers of their property, to the shoulders of their grantees, who were willing to assume such liability as owners and controllers of the property for the time being. They had probably been advised that they could do so. The statute does not so forbid.

They executed the contracts in good faith and had them recorded when they gave notice to the public, thus shifting all ownership and control of the property and right to possession thereof, to their grantees who assumed the same for a full consideration therefor. Their object in doing so was not to evade

the law but to comply with it, to surrender their ownership and control and avoid the liability. This was not to prevent or hinder the enforcement of the criminal law, but to prevent themselves from being classed as criminals by reason of their ownership and control of the property. This, in no wise, prevented the State from prosecution of those who were in actual occupancy, ownership and control of the property, or from closing and abating the property as a nuisance.

The plain intent of the legislature was to render the property, through those who owned and controlled it, liable for the offense, and was not intended to effect those who were remotely interested, but who were not owners and controllers thereof.

The statute being derogatory to the common law, and an evasion of the rights of individuals not personally guilty of crime, should be confined to those mentioned in it by a strict construction thereof, and not extended to cover those who were endeavoring in good faith to avoid being guilty of offending against its express meaning. To extend its purpose and meaning by play upon the words shift, devise and evasion, to include those not within its terms is to legislate and not construe.

Courts should confine themselves to construction and should not usurp legislative powers, unless the demand for so doing is imperative. In this case no such imperative demand exists, as the State is all powerful to close all such houses, without resorting to the doubtful expedient of punishing an old man and woman who are guilty of no criminal intent to evade its law; while hundreds who are actually guilty of participating in the offense, and patronize and uphold its evil, are permitted the freedom of the city. I may be wrong owing to my limited information on the subject, but to such injustice I can not assent, although I have no sympathy with wrong of any kind.